UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JENNIFER DAIGLE,
*Plaintiff*,

v.

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,
*Defendant*.

No. 3:19-cv-00724 (JAM)

**ORDER REMANDING DECISION OF COMMISSIONER OF SOCIAL SECURITY**

Plaintiff Jennifer Daigle claims that she is disabled because of migraine headaches so severe they cause her to lose consciousness. She has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security, who denied her claim for Title II social security disability insurance benefits. Daigle has filed a motion to reverse the decision of the Commissioner, Doc. #14, and the Commissioner has filed a motion to affirm his judgment, Doc. #18.[1] For the reasons discussed below, I will grant Daigle's motion in part, and will remand the decision of the Commissioner.

### BACKGROUND

Jennifer Daigle is a 33-year-old former healthcare provider, with licenses, now lapsed, as a Certified Nurse Assistant and EMT. Doc. #14-2 at 1 (¶¶ 3-5). She stopped working principally because of a persistent low-level headache that escalates into a migraine unpredictably but frequently, as often as four or five times a week. *Id*. at 1 (¶ 7). Daigle reports that these headaches have responded only partially to medication, *id*. at 2-3 (¶¶ 10, 11, 15), and are sometimes so severe that they knock her unconscious—once while in the shower, and another

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Clerk of Court shall substitute the Commissioner of Social Security Andrew M. Saul as the defendant in place of Acting Commissioner Nancy A. Berryhill who was initially named as the defendant.

two times while she was driving, leading to collisions, *id*. at 2 (¶11). The migraines are so debilitating that while they are in progress she cannot perform household work or look after her dogs. *Id*. at 3 (¶¶ 14-15). Daigle's additional impairments include knee arthritis, neck pain, poor sleep, panic attacks, and fatigue or nausea as a side-effect of the (relatively ineffective) migraine medication. *Id*. at 2-3 (¶¶ 11-12, 16-18).

Daigle filed an application for Title II disability insurance and disability benefits on May 12, 2016. She initially claimed a disability onset date of December 18, 2015, amending it in her pre-hearing memorandum (without objection) to July 1, 2016. Doc. #11 at 16 (Tr. 12).[2] Daigle's claim was denied on July 14, 2016, *ibid*, and denied again upon reconsideration on October 19, 2016. *Ibid.* She then timely filed a written request for a hearing by an ALJ on December 6, 2016. *Ibid*.

Daigle appeared with counsel and testified at a hearing before ALJ John Aletta on March 29, 2018. *Ibid*. A vocational expert testified by phone. *Ibid.* On April 11, 2018, the ALJ issued a decision concluding that Daigle was not disabled within the meaning of the Social Security Act. *Id.* at 16-27 (Tr. 12-23). The Appeals Council denied Daigle's request for review on April 1, 2019. *Id*. at 5 (Tr. 1). Daigle then filed this federal court action on May 14, 2019. Doc. #1.

To qualify as disabled, a claimant must show that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[2] Page references are to the pagination generated on the Court's CM/ECF docket. For ease of reference, a citation to the internal Social Security Administration transcript number is provided in the form (Tr. ##).

engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a)-(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

The agency engages in the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or his past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); 20 C.F.R. § 404.1520(a)(4).

In applying this framework, if an ALJ finds a claimant to be disabled or not disabled at a particular step, the ALJ may make a decision without proceeding to the next step. *See* 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proving the case at Steps One through Four; the burden shifts at Step Five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

After proceeding through all five steps, the ALJ concluded that Daigle was not disabled within the meaning of the Social Security Act. At Step One, the ALJ determined that Daigle had

not engaged in substantial gainful activity since July 1, 2016, the amended onset date. *Id.* at 18 (Tr. 14).

At Step Two, the ALJ concluded that Daigle suffered from the following severe impairments: migraines, bilateral patellofemoral arthritis of the knees, anxiety, depression, posttraumatic stress disorder, and panic disorder. *Ibid.* The ALJ further determined that Daigle had additional medically determinable non-severe impairments: ovarian cysts, degenerative disc disease of the cervical spine, degenerative joint disease of the right knee, and Lyme disease. *Id.* at 19 (Tr. 15).

At Step Three, the ALJ determined that Daigle did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Ibid.* The ALJ then found that Daigle had a residual functional capacity (RFC) to perform medium work as defined in 20 CFR 404.1567(c) except she could only occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, frequently kneel, crouch and crawl. Further, the ALJ determined that she must avoid concentrated exposure to working with moving mechanical parts and must never work at unprotected heights. She must avoid concentrated exposure to dusts, odors, fumes and other pulmonary irritants. She can work in environments having a moderate noise level and cannot tolerate concentrated exposure to lighting brighter than fluorescent lighting ordinarily found in office environments. She can perform simple, routine and repetitive tasks. She cannot tolerate interaction with the public and can tolerate occasional interaction with coworkers and supervisors. She can tolerate only occasional changes in her work setting and work procedures, which are simple and routine in nature, can set basic work goals and plans, and can travel to familiar locations. *Id.* at 20-25 (Tr. 16-21).

At Step Four, the ALJ concluded that Daigle was unable to perform any past relevant work through the date last insured. *Id.* at 25 (Tr. 21). At Step Five, the ALJ relied on the testimony of a vocational expert, Richard B. Hall, who opined that a person of Daigle's age (37), education (post high school), work background, and RFC could perform tasks associated with positions that represented around half a million jobs in the national economy.

Hall went on to testify that if someone in Daigle's position "was off task 15 percent of the time during each eight-hour workday," *id.* at 70 (Tr. 66) or "was absent from work two days per month on a random unscheduled basis," *id.* at 71 (Tr. 67), then there would be no jobs in the national economy available to such a person. Under cross examination, Hall revised these opinions downward, testifying that just *one* day off from work per month on an ongoing basis, or *10* percent of the workday being taken off task (such as by taking two additional unscheduled 10-minute breaks in an hour), "would have an adverse vocational impact and preclude all jobs." *Id.* at 72 (Tr. 68).

Nonetheless, the ALJ ultimately concluded that Daigle's migraines did not lead her to being off-task for any appreciable fraction of the day or appreciable fraction of the days of a given month, and accordingly held that Daigle was not disabled within the meaning of the Social Security Act since July 1, 2016. *Id.* at 27 (Tr. 23).

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Daigle claims the ALJ erred in two ways. First, Daigle argues that the ALJ's conclusions as to the severity of Daigle's headaches traversed the treating physician rule and were not supported by substantial evidence. Second, Daigle argues that the ALJ failed to reconcile the conflicts between noise level of potential jobs stated by the vocational expert and the noise levels described in the Directory of Occupational Titles.

## I. *Evaluation of Daigle's migraine headaches*

Daigle's principal disability, in her account, are her migraine headaches—headaches so severe that they caused her to fall unconscious, or at least be unable to function until they passed, and that recurred four or five times a week. The ALJ concluded that the medical evidence supported a finding that Daigle had migraine headaches, but her "statements concerning the intensity, persistence, and limiting effects of [her migraines] are not entirely consistent with the medical evidence and other evidence in the record." Doc. #11 at 22 (Tr. 18).

Daigle argues that this conclusion, which was necessary to the ALJ's ultimate finding of no disability, was erroneous in two ways: first, it discounted treating physician Dr. Lillard's opinion about off-task time in violation of the treating physician rule; second, even if Dr. Lillard's opinion was properly discounted, the ALJ's findings concerning the severity of Daigle's migraines were not supported by substantial evidence. *See* Doc. #14-1 at 6-11.

### A. *Treating physician rule*

The treating physician rule requires that "the opinion of a [plaintiff's] treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)).

In a March 2018 medical source statement about Daigle's headaches, Dr. Lillard "opined that the claimant's symptoms were severe enough that she would be off-task for twenty-five percent of the workday," Doc. #11 at 24 (Tr. 20); *see id.* at 1124-26 (Tr. 1120-22) (Lillard source statement, Ex. 22F). The ALJ accorded "little weight to the opinions in the [March 2018] medical source statement from Dr. Lillard," Doc. #10 at 24 (Tr. 20), finding that the doctor's "treatment records do not support these limitations [because] they contained statements from the claimant that the medications she was using for headache pain were working well." *Id.* at 24 (Tr. 20). Giving the Lillard opinion less than controlling weight was necessary to the ALJ's finding of no disability, because, as vocational expert Hall explained, twenty-five percent of off-task time would preclude all work and therefore direct a finding of disability.

When the treating physician's opinion is not given controlling weight, "the ALJ must explicitly consider" a number of factors to determine the proper weight to assign to the opinion, including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*)); *see generally* 20 C.F.R. § 404.1527(c). The ALJ then must "give good reasons in [his] notice of determination or decision for the weight [given the] treating source's [medical] opinion." *Estrella,* 925 F.3d at 96

7

(quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*)). Unless "a searching review of the record" provides assurance that "the substance of the treating physician rule was not traversed," an ALJ's failure to apply the factors set forth by the Second Circuit leaves the Court unable to conclude the error was harmless and requires remand. *Estrella,* 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32-33).

The ALJ did not explicitly consider factor one: the frequency, length, nature, and extent of treatment. A searching review of the record indicates that this factor cuts strongly in *favor* of granting controlling weight to Dr. Lillard's opinion. Dr. Lillard was Daigle's primary care physician since 2015. *See* Doc. #11 at 262 (Tr. 258). She is one of the few constant presences in the medical record: Dr. Lillard saw Daigle every three months, *id.* at 288 (Tr. 284), and repeatedly evaluated Daigle's migraines, ordering tests, prescribing medications, and referring Daigle to specialist after specialist in what would prove to be a vain hope of effective treatment. *See, e.g.*, *id.* at 417, 427, 554, 585, 590, 617, 627 (Tr. 413, 423, 550, 581, 586, 613, 623).

More importantly, on factor two, the ALJ's conclusion that Dr. Lillard's "treatment records do not support the[] limitations" of being off-task for at least twenty-five minutes a day (factors two and three) appears not to be supported by *any* evidence, barring three fleeting remarks in Dr. Lillard's notes that support the ALJ's conclusion only if they are taken out of context.[3] Indeed, a review of any of the contemporaneous lists of medications Daigle was

---

[3] Specifically, in treatment notes dated July 20, 2016, Doc. #11 at 755 (Tr. 751), Dr. Lillard described "migraines 3-4 times per week relieved by pain meds," but the remainder of that record indicates that this phrase was shorthand for "pain meds *have been prescribed to relieve* Daigle's migraines," rather than that pain medications were effective: Dr. Lillard increased pain medicine dosage in that very note, *ibid*, and in a follow up note in September 8, 2016, reported that notwithstanding even this increased dose, "ongoing headache with light sensitivity…[Daigle] was nauseous and vomiting the other day." *Id.* at 759 (Tr. 755). In a similar way, Dr. Lillard reported that methadone "is working well" in a treatment note made in November 2017, *id.* at 1065 (Tr. 1061), a report the ALJ expressly noted in his opinion, *see id.* at 23 (Tr. 19), but the very next words of Dr. Lillard's note read: "still need something for breakthrough headaches when they are really bad"—the "breakthrough headaches" being, of course, the migraines that form the basis of Daigle's disability claim. *Id.* at 1065 (Tr. 1061). Finally, in January 2018, Dr. Lillard again noted that methadone was "working well" but as treatment for pain from Daigle's cervical

8

administered, *see, e.g.*, *id.* at 412 (Tr. 408) (medication list as of March 2016), shows that Daigle was prescribed a medicine cabinet's worth of treatments, all of which have—judging by the constant headache complaints throughout the record—were ineffective. *See also id.* at 649 (Tr. 645) (Dr. Lillard notes listing "nonsteroidal anti-inflammatory drugs, non-opioid analgesics, opioid analgesics, triptans, antiemetics, antidepressants, anticonvulsants, beta blockers, calcium channel blockers and botox" as treatments tried and failed).

Dr. Lillard's remaining treatment records amply support her medical source statement's conclusion that Daigle's migraines were frequent, incapacitating, and did not respond to treatment. For example, in September 2015, Dr. Lillard explained that "given the frequency of [Daigle's] migraines, she runs out of [prednisone, a treatment for acute migraines] every month. [Daigle] has a very complex history with the migraines and has consulted with at least a couple of different neurologists without success." *Id.* at 648 (Tr. 644). In November 2015, Dr. Lillard reported that "[f]or the chronic migraine headaches, [Daigle] has tried almost every pharmaceutical remedy, including botox, without success." *Id.* at 642 (Tr. 638).[4]

Two years later, in March 2017, Dr. Lillard described yet another "neurologist [who] suggested [Daigle] sign up for a study at Yale re: *intractable* migraines; [Daigle] is working on this, meanwhile, the pain medication is not helping, and she would like to discontinue the fioricet as it is giving her anxiety." *Id.* at 935 (Tr. 931) (emphasis added). In August of that same year,

---

degenerative disc disease; the same page of the treatment notes go on to describe the "migraine" as "intractable." *Id.* at 1100 (Tr. 1094). I note as well that neurologist Dr. Alessi opined in 2016 that Imitrex "has been effective but for a short period of time," for headaches, particularly when the medication was injected subcutaneously, *id.* at 778 (Tr. 774), but Dr. Lillard explained in a subsequent treatment note at that "Dr. Alessi could not help her," *id.* at 755 (Tr. 751).

[4] This testimony, as well as the many specialist records described below, make it clear that the ALJ's claim that Daigle "has not followed through with the recommendation that she see a headache specialist," Doc. #11 at 22 (Tr. 18), is not supported by substantial evidence. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012).

9

Dr. Lillard reported, once again, that Daigle's "chief complaint [was a] migraine for 2 days, usual medication not helping." *Id.* at 1056 (Tr. 1052).

As for factor three, Dr. Lillard's medical source statement is also supported by the notes of a large cast of other doctors, including specialist neurologists, all of whom concluded that Daigle's migraines simply did not respond adequately to any treatment whatsoever. Between February and April 2015, Dr. Kuruvilla, a neurologist at Yale Medicine, opined that Daigle regularly had an "awful migraine," *id.* at 605, and her medicines "[were] not helping, *id.* at 604; Dr. Kuruvilla noted that Daigle's reports that she was "already on a bunch of preventatives and needs an abortive mediation," that is, a medication that would terminate the migraines not prevented by the preventatives. *Ibid.*

Tellingly, Daigle explained to Dr. Kuruvilla in 2015 that "she [Daigle] has already lost 3 jobs because of her migraines and doesn't want to lose this one." *Id.* at 603-04 (Tr. 599-600). A year later, Dr. Alessi, another neurologist, explained that "Based on my clinical evaluation today of Ms. Daigle is my feeling that she is suffering from migraine headaches. She has been on multiple medication regimens with little relief." *Id.* at 751 (Tr. 747).

As to factor four, although Dr. Lillard's qualifications as a general practitioner are perhaps not as great as a treating neurologist (many of whom Daigle saw, and none of whom seemed to have a workable treatment regimen for her), they compare very favorably to that of the non-examining State agency medical consultants, John Warren, Ed. D., and Christopher Leveille, Psy.D., both "licensed clinical psychologists" whose opinions were given "great weight" by the ALJ. *Id.* at 20 (Tr. 24) (ALJ opinion). Migraines are a neurological and not psychological condition—as the Social Security Administration's own guidance makes clear. *See* Soc. Sec. Rul. 19-4p, *Titles II and XVI: Evaluating Cases Involving Primary Headache*

*Disorders* (Aug. 26, 2019), *available at* https://www.ssa.gov/OP_Home/rulings/di/01/SSR2019-04-di-01.html; *see also Federman v. Chater*, 1996 WL 107291, at *2 (S.D.N.Y. 1996) (summarizing medical characterizations of migraines). Appropriately, Daigle's psychological evaluations discuss her migraines not as a psychiatric problem but as an understandable contributor to mental illnesses like depression and anxiety, *see* Doc. #11 at 773 (Tr. 769) (evaluation of Dr. DeAsis, treating psychiatrist).[5] Consideration of Dr. Lillard's relative expertise would, then, have favored her opinion about Daigle's migraines over those of these non-examining consulting physicians as well as any non-neurologists in the record.

Nor is it otherwise clear how the ALJ could give great weight to the non-examining consultants opinions. Dr. Warren's evaluation reviewed only "anxiety symptoms," Doc. #11 at 83 (Tr. 79), while Dr. Leville's evaluation appears to contain no discussion of any symptoms, instead cut-and-pasting boilerplate descriptions into the relevant form fields, *see id*. at 103 (Tr. 99). These bare-bones check-box evaluations did not expressly consider Daigle's migraines and cannot sustain the weight the ALJ's evaluation places on them, especially in the teeth of thorough and well-supported opinion evidence by treating physician Dr. Lillard. *See Jazina v. Berryhill*, 2017 WL 6453400, at *7 (D. Conn. 2017).

Unless "a searching review of the record" provides assurance that "the substance of the treating physician rule was not traversed," an ALJ's failure to apply the factors set forth by the Second Circuit leaves the Court unable to conclude the error was harmless and requires remand. *Estrella,* 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32-33). Here, a searching review of the record finds no reason to discount an experienced treating physician's opinions, formed over

---

[5] That the ALJ repeatedly misspelled this treating provider's name as "DeAsia," *see* Doc. #11 at 23-25 (Tr. 19-21), does not inspire confidence.

11

years of constant treatment of the claimant, that appear to be completely consistent with voluminous record evidence—not to mention the opinions of a bevy of additional specialists. At a minimum, therefore, remand is required. *See Lesterhuis v. Colvin*, 805 F.3d 83, 89 (2d Cir. 2015); *cf. Halloran*, 362 F.3d at 32.

### B. *Substantial evidence for migraine conclusions*

Daigle argues that even if the medical source statement of Dr. Lillard is discounted, there was not substantial evidence for the ALJ's conclusion that she would spend less than ten percent of the workday, or one day a month, off-task or absent. I agree, in part for the reasons discussed above. Two errors in the ALJ's analysis merit further discussion. First, the ALJ's conclusion as to the migraines' capacity to induce blackouts was unsupported by the record. Second, the ALJ's conclusions as to Daigle's noncompliance with treatment plans and drug addiction similarly lack record support.

The ALJ recognized, as he surely had to, that Daigle had documented loss of consciousness owing to her migraines—after all, she was hospitalized after the car crashes they caused. But the ALJ went on to dismiss "statements by the claimant that she had lost consciousness" because "these events were intermittent," Doc. #11 at 22 (Tr. 18), and dismissed similar statements from Dr. Lillard to this effect as "inconsistent with [Diagle's] testimony." *Ibid.* On the contrary: Dr. Lillard's notes respecting "acute migraine with syncope" (*i.e.*, migraines triggering unconsciousness) explained it was "a recurrent issue" in June 2016, *id.* at 611 (Tr. 607). Dr. Lillard's treatment notes for both 2016 and 2017 repeatedly listed syncope as an "active problem" or a "symptom" of migraines, *see, e.g.*, *id.* at 626 (Tr. 622) (January 2016); *id.* at 622 (Tr. 618) (February 2016); *id.* at 615 (Tr. 611) (April 2016); *id.* at 611 (Tr. 607) (June 2016); *id.* at 759 (Tr. 755) (September 2016); *id.* at 942 (Tr. 938) (December 2016); *id*. at 939

12

(Tr. 935) (January 2017); *id.* at 935 (Tr. 931) (March 2017). The record does not support the ALJ's conclusion that Dr. Lillard or Daigle's testimony as to the severity of the syncope episodes or their frequency was significantly contradicted either by the other's statements or by any other medical evidence.

Even more puzzling than the ALJ's unsupported rejection of the record's incessant reports of syncope is the ALJ's conclusion that the car accidents these syncope episodes caused could be discounted because the *collisions* caused no "serious injuries." Doc. #11 at 22 (Tr. 18).[6] Setting aside the curious results of this line of reasoning (if Daigle had inflicted "serious injuries" on *others* in an auto accident from a migraine syncope, do her headaches suddenly become disabling? Are migraines only disabling if they cause car crashes that inflict still more disabling injuries on the migraine-sufferer?), it is irrelevant to the question at hand: whether Daigle's migraines regularly recurred and regularly caused syncope that would necessarily cause her to take off enough unscheduled time to render her unemployable. The auto collisions lend powerful support to the former possibility, as well as the sincerity of Daigle's desire to work and the very real obstacles to that work the migraines presented. Put bluntly, a migraine sufferer claiming syncope is probably not exaggerating their severity when those migraines caused her to crash a car. That mercifully no-one was seriously injured by the crashes does not discount the severity of the condition that directly led to them.

Second, the ALJ's conclusions that Daigle did not follow through with treatment recommendations, was addicted to painkillers, and was beset by rebound headaches are each unsupported by the record. Although Dr. Kuruvilla, one of the many specialists Daigle saw over the years, opined in April 2015 that she "suspect[ed]" Daigle was abusing painkillers, *see id.* at

---

[6] The collisions also undermine the ALJ's RFC determination that Daigle could "travel to familiar locations." Doc. #11 at 21 (Tr. 17).

13

603 (Tr. 599), and noted that Daigle was a "no show" at a botox appointment, these activities took place before the amended onset date of July 1, 2016 and there is no post-2016 *evidence*, rather than a doctor's "suspicion," of painkiller abuse. By November 2015, Dr. Lillard reported, without contradiction elsewhere in the record, that Daigle had indeed received botox treatment "without success." *Id.* at 642 (Tr. 638).

Likewise, Dr. Ferguson, a primary care provider who appears to have treated Daigle largely before the onset date, opined that over-use of painkillers was causing rebound headaches, *id*. at 357 (Tr. 353). But Dr. Ferguson's notes indicate that she appeared to believe that all painkillers caused migraines, *see, e.g.*, *id*. at 390 (Tr. 386).[7] Even if this were true as a medical matter, it traps Daigle in a Hobson's choice: she could be disabled by migraines, or she could take painkillers only to be subject to more disabling migraines as a rebound effect. This is hardly an indicator that Daigle's symptoms were either mild or self-inflicted, and renders contradictory the ALJ's conclusion that Daigle could simultaneously be faulted for taking painkillers that caused "rebound" headaches and lack disability because her painkillers were "working well."

All of these conclusions were necessary (if not sufficient) components of the ALJ's determination that Daigle's RFC incorporated no off-task time or off-work days, which in turn was essential to the ALJ's Step Five determination of no disability. Because they were not supported by substantial evidence, they serve as an independent basis for remand. *See Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983).

## II.  *Step Five consideration of workplace noise*

---

[7] In fairness, exactly what Dr. Ferguson thought is open to debate; in another treatment note from 2014 she explained that Daigle "did not experience improvement in migraines with the medication [Depakote], nor with any other migraine medications, *although her migraines are now more frequent while off the medication*." Doc. #11 at 362 (Tr. 358) (emphasis added).

14

The RFC that the ALJ ultimately found incorporated a limitation of "moderate noise level" and lighting "no brighter than fluorescent lighting ordinarily found in office environments." Doc. #11 at 20-21 (Tr. 16-17). Daigle argues that the ALJ failed to properly account at Step Five for the discrepancy between the noise and lighting levels of the alternative jobs proposed by the vocational expert and the noise and lighting levels of those jobs described in the Dictionary of Occupational Titles ("DOT"). I agree with Daigle that the ALJ did not permissibly reconcile discrepancies in the vocational expert and DOT evidence.

The Commissioner bears the burden of "show[ing] that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). A 2000 Social Security Administration Policy Interpretation Ruling governs the Commissioner's assessment of whether any particular job can accommodate a given claimant's physical limitations. Under the Ruling, the Commissioner "rel[ies] primarily on the [DOT] ... for information about the [job's] requirements" but "may also use [vocational experts] ... to resolve complex vocational issues." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). If the Commissioner does consider the testimony of such experts, however, he must be alert to the possibility of "apparent unresolved conflict[s]" between the testimony and the Dictionary. *Ibid*. In light of this possibility, the Ruling tasks the Commissioner with "an affirmative responsibility to ask about any possible conflict," *id*. at *4, and to "elicit a reasonable explanation for [any such] conflict before relying on the [vocational expert's testimony]," *id*. at *2.

The Second Circuit has set out in detail what the ALJ must do to comply with this ruling. *See Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87 (2d Cir. 2019). Where an expert's testimony *seems to* conflict with the Dictionary, even if this conflict is not obvious, the ALJ must

15

engage in "a meaningful investigatory effort to uncover apparent conflicts, beyond merely asking the vocational expert if there is one" and then "reconcile" the conflicts so identified. *Id.* at 94.

In this case, when the vocational expert was asked to describe whether a hypothetical person in Daigle's position could perform work, he listed "as examples" three jobs drawn from the DOT: "packer," "kitchen helper," and "material handler," all of which the expert opined experienced only moderate noise akin to an office environment, consistent with Daigle's RFC. Doc. #11 at 68-69 (Tr. 64-65). In listing these jobs, with their DOT reference numbers, the expert went on to testify that the DOT did not incorporate noise level limitations; when the ALJ asked the expert whether "the DOT specifically address[es] the limitations involving . . . working in environments having a moderate noise level," the expert responded "No." *Id.* at 69 (Tr. 65).

This answer was incorrect. As the Commissioner conceded at oral argument, the DOT's companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), which is treated as part of the DOT, *see Lockwood*, 914 F.3d at 90 n.2, does in fact define noise intensity level for each profession, grading each job on a five point scale from "very quiet" through "moderate" to "very loud," and providing illustrative examples of each noise level. *See generally* U.S. DEP'T OF LABOR, SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES (1993), *available at* https://perma.cc/26AE-RUFS (hereafter "SCO").

The SCO describes the noise level of all three jobs that the vocational expert listed as "loud." For two of the listed jobs—"packer," (DOT code 920.587-018) and "kitchen helper," (DOT code 318.687-010)—this conclusion is plainly set forth in the SCO. The third job the expert listed presents special problems. The ALJ described this job as "material handler," but both the expert and the ALJ misidentified the DOT number for this job as 922.687-058, *compare*

Doc. #11 at 68 (Tr. 64) (expert testimony) *with id*. at 26 (Tr. 22) (ALJ determination). The referenced DOT job number—922.687-058—in fact corresponds to "laborer, stores" in the DOT, which the SCO indeed defines as having a "moderate" noise intensity level. But the correct DOT number for a "material handler" is 929.687-030, and the SCO defines this job as having a "loud" noise intensity level. It is unclear whether the expert or the ALJ were relying on the correct number but mislabeling the position, or relying on the correct position but misreading the number.

In any event, at least two of the jobs listed by the expert have a "loud" noise intensity level. The SCO lists examples of loud workplaces as a "can manufacturing department; large earth-moving equipment; heavy traffic." SCO at 620. The expert, by contrast, defined moderate noise as "typically what's found in an office environment or quieter . . . [ex]amples that would not be moderate would be construction or working luggage of airplanes." *Id*. at 72 (Tr. 68). Daigle's testimony, to say nothing of her medical records, made it clear that a job with the noise level of a can manufacturing department was completely out of the question.[8]

There was a conflict between the expert's testimony that a kitchen helper or packer or material handler were exposed to "moderate" noise and the SCO, which declared the noise of all three jobs "loud." Far from recognizing the conflict or resolving it, both the ALJ and the expert proceeded on the assumption that it did not exist—and cited the wrong DOT occupational numbers, to boot. The Second Circuit has made plain that the Commissioner has a duty "to identify and resolve apparent conflicts between [the Dictionary] and [vocational expert]

---

[8] Daigle also objects to the ALJ's acceptance of the expert's testimony about the lighting of these proposed jobs, but I agree with the Commissioner that given the relative silence of the SCO on lighting questions, there was no conflict between the expert's testimony and the DOT; it was reasonable for the ALJ to rely on the expert's professional experience in determining relative lighting of the listed jobs. *See McIntyre,* 758 F.3d at 152 ("a vocational expert is not required to identify with specificity the figures or sources supporting his conclusion").

17

testimony," *Lockwood*, 914 F.3d at 93, and that this duty "is not fulfilled simply by taking the [vocational expert] at his word that his testimony comports with the [Dictionary] when the record reveals an apparent conflict." *Ibid*., 914 F.3d at 93. Particularly where the noise level was a key part of the RFC, *Lockwood* provides a third reason for remand.

### III. *Nature of Remand*

I have concluded that the ALJ has committed at least three errors worthy of remand. Accordingly, I must now determine whether to remand the matter to the ALJ to reconsider his analysis (specifically, to afford Dr. Lillard's opinions appropriate weight, to properly account for evidence of Daigle's syncope and her inability to find effective migraine treatment, and to consider the SCO's noise level definitions), or simply to reverse and remand to the Commissioner solely to calculate Daigle's benefits.

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard," the matter should be remanded to the Commissioner "for further development of the evidence." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). But when a court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for a calculation of benefits is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999); *see also Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir. 2020) (same). In sum, when there is "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," remand for calculation of benefits is the proper course. *See Parker*, 626 F.2d at 235.

It seems to me that remand for further evidentiary proceedings is appropriate. The vocational expert opined that a greater than ten percent per day off-task time would preclude all work given other elements of Daigle's RFC, but as discussed above, the formulation of the RFC

presented to the vocational expert was itself riddled with errors. *Contrast Masoud v. Saul*, 2020 WL 1329648, at *10 (D. Conn. 2020) (hypothetical RFC rejected was in fact only RFC supported by substantial evidence, providing basis for remand for calculation of benefits); *Russell v. Saul*, 2020 WL 1466243, at *9 (D. Conn. 2020) (same).

It is possible that the vocational expert, upon presentation with a new RFC, might opine that a greater percentage of off-task time is possible in certain jobs. Meanwhile, although the ALJ traversed the treating physician rule by rejecting Dr. Lillard's opinion, it is possible that upon reconsideration and a thorough review of the record in light of the *Estrella* factors, that the ALJ might reasonably conclude that Daigle's off-task time, while greater than zero, is less than ten percent, or whatever percentage of off-task time is found to be compatible with jobs existing in the national economy. *See Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) ("[i]t is not the function of a reviewing court to decide de novo whether a claimant was disabled"); *see also Lewis v. Berryhill*, 2018 WL 6040264, at *3 n. 1 (D. Conn. 2018) (declining to reverse for calculation of benefits when record did not make clear that claimant would be off-task for more than 10 percent of a given day). All in all, I am very skeptical that the Commissioner has a proper basis to deny Daigle's application on remand, but I cannot conclude that the record is so one-sided that a remand for calculation of benefits is required.

## CONCLUSION

For the reasons set forth above, Daigle's motion to reverse the decision of the Commissioner (Doc. #14) is GRANTED IN PART insofar as the Commissioner's decision is remanded, and the Commissioner's motion to affirm the decision of the Commissioner (Doc.

#15) is DENIED. The Clerk of Court shall close this case.

Dated at New Haven this 28th of September 2020.

                                                    /s/ *Jeffrey Alker Meyer*
                                                    Jeffrey Alker Meyer
                                                    United States District Judge